Your Honor, it's the fourth case of the morning, call 209-1083. Barbara Ruisard at all versus the Village of Glen Ellyn in T-Mobile Central. On behalf of the Airborne Officer, Mr. Charles Chaffin. On behalf of the affilee of T-Mobile, Mr. Rayford Palmer. And the affilee's Village of Glen Ellyn, Ms. Ellen A. Henry. Will there just be two attorneys arguing? That's correct, sir. All right, make your seat. Well, being no disrespect to my esteemed senior colleague who's running the show here, but I think this one place would want to make sure no cell phones ring. Especially Mobile T-Verizon or AT&T. There's no pun intended with those companies. I thought there was. That could be. You're taking judicial notice. Okay. Make your seat. May it please the court. Good morning, Your Honors. My name is Charles Chaffin and I represent the plaintiff's appellants in this case. The lower court dismissed with prejudice plaintiff's second amended complaint because it found that plaintiffs had failed to properly plead damages under a state statute and Glen Ellyn Village ordinance to maintain standing to bring such an action. The state statute is known as the Illinois Adjacent Landowners Act. It is codified at 65 ILCS 1113.15, and I'll just refer to it as 1113.15. The village ordinance is 1010.18, and it doesn't have a common name. So I'll refer to it as 1010.18. The plaintiffs respectfully submit that the lower court erred when it found not only that the plaintiffs didn't properly plead damages, but that it was required to plead damages at all. The plain language of 1113.15 expressly states, and I quote, an owner or tenant need not prove any specific, special, or unique damages to himself or his property or any adverse effect upon his property from the alleged violation in order to maintain a suit under the foregoing provisions. An oral argument on September 14th when the court dismissed plaintiff's Second Amendment complaint. The court did not, in its decision, address the plain language of the statute. The court simply referred back to a prior order it had entered in April of 2009 where it had found that we did not properly plead the damages necessary to maintain an action. Did the court give any indication as to what it was looking for? Did the court believe that this would have to be something in the nature of a nuisance? Did the court indicate what it was looking for that would establish a threshold violation? Good question. There were two ordinances at issue. The first is 3810, which requires the village to keep antennas, quote, at a minimum on the water tower, and we were seeking to enforce the at a minimum language. And then there was 5606, an ordinance that granted T-Mobile the right to construct a large tripod. We called it a megapod in our brief because it's four-and-a-half-ton concrete structure, seven-and-a-half feet tall, 14 feet wide, that they mounted all their antennas on. So there were two ordinances. With respect to 5606, the court said that we had failed to show how we had been injured by the violations. In other words, we had alleged, and it's undisputed, that the defendants are willfully violating the height restrictions in 5606 with respect to the safety antennas that are on top of the water tower. They can only be 140 feet. If they're going to exceed 140 feet, the defendants have to go and get a special use permit. Currently, those antennas are almost 10 feet higher than the allowed use. Has there been any change in the height of the antennas from the time of the judgment in Sterling until the present time so that this issue is moved? I am unaware of any change at all to the heights of the antennas. Certainly, I would think if there were changes, we would have heard about it and we would have confronted a mootness argument, but we haven't had that. Going back to your question, Justice Hudson, the court said that because we couldn't show or hadn't alleged that the portions of the antenna exceeding the height restrictions had damaged us, so if the antenna is 30 feet tall and it's the 10 top feet of the antenna, the lower court was requiring us to show how we were damaged by the 10 feet that it was over. Which you find to be a very difficult burden to be able to, as a practical matter, correct? Very difficult, but I will say that, and respectfully, I think the lower court erred because once there's a violation, then you've shown the necessary predicate to maintain your standing. That is the substantial effect. It's the violation. And does the Greer case also provide support for that proposition? It does. Greer says it is the nature of the zoning violation itself that establishes a substantial effect sufficient to enable an owner to maintain an action for injunctive relief. Is it possible the judge thought that foot or two was not a substantial violation or it did not have a substantial effect on the owners? The court did not, to my recollection, make any statement about it being a de minimis violation, but, Justice Bowman, I will tell you that the Illinois courts, in fact, this court, I'm sorry, the third district in Rider, confronted a situation where a defendant had encroached one foot over the property line into the plaintiff's yard, among other things. And the court said, the characterization of these violations as mere technical violations makes a mockery of the legislature's efforts to protect the health and safety of property owners by regulating property use. If we allow intentional flagrant violations of our zoning laws, we make it likely that zoning ordinances will be disregarded with greater frequency in the future. So I would submit, based on this type of case law, that it's inappropriate for a judge to engage in a de minimis argument. But here, I don't think we have that. We have antennas that are almost ten feet higher than they're supposed to be. You have antennas that were mounted on the megapod that they weren't authorized to relocate and mount on there. You have dangerous high-voltage electrical equipment that is outside the tower, that is under the statute or the ordinance, supposed to be located within the tower. And then you have the presence of potentially harmful radio frequency emissions as a result of all these nine antennas going up there with this megapod and all the new commercial electrical voltage equipment. We need to set that aside for the moment. I mean, that may be preempted by the Federal Telecommunications Act, but looking at the height of the towers themselves, are we saying there's diminished property value because they're unsightly, they're intrusive? What is the effect on the neighbors in the neighborhood about having these antenna wires that are just higher than they're supposed to be? The effect of the antennas on the neighbors is threefold. Number one, by having these antennas exceed their height restrictions, they extend higher into the sky, they're more prominent, they're more dominating, they're more omnipresent into the community. This is a residential zone area. It is not an area where you're allowed to have, as a practical matter, these types of commercial-grade equipment. So they're unsightly, and they diminish property values as a result of it. And the case law is clear on that, that the courts consider that, the aesthetic value, the unsightliness of the antennas, and we've cited those cases in our brief about how that diminishes property value. The property value is also diminished by the large signage they put on the water tower warning people of the dangerous levels of radiofrequency emissions. So that also diminishes property value. The presence of this commercial-grade electrical high-voltage equipment similarly diminishes property values. We've also alleged in the second amended complaint that as a result of this, the owners, the individuals in the 1,500-foot area, have lost use and enjoyment of their property through the obstruction and blocking of sight lines and views by this megapod and these antennas now that are well in excess of what they're supposed to be in terms of height. The plaintiff has the right to file for special use to have an exception for the overage on antennas. Is that correct? That is correct. In fact, 5606 requires the defendants to seek a special use permit when they're over 140 feet. The judge recognized that they were over 140 feet, and the defendants have never contested that they're under 140 feet. They're over. But they've never went and sought a special use permit, and I can tell you that they're not going to be able to lower those antennas. They've got to keep them at that height, and they don't want to go back before the village given what's happened now and try to get a special use permit. So they haven't done anything, and they're riding it out to see what happens in the courts. It's possible, of course, that by relocating the antennas, the picturesque effect could be a lot worse for the neighbors than if they had the antennas in the present position, but I assume the neighbors considered that. Not only did the neighbors consider it, but the village did too. As we've alleged in the complaint, there were four sites that the village looked at for locating these T-Mobile antennas, and the review was done by their own expert, a professor from Northwestern named Professor Tafloff, and he found that there were four, three other sites besides the water tower that provided commercially acceptable coverage for T-Mobile's customers in the downtown Glen Ellyn area. And so what we've alleged is, in light of the existing antennas that were already on the water tower and in light of these other perfectly feasible sites, there was no need to locate that tripod, that megapod, and those antennas on the water tower. Now, in the complaint, we've alleged that that provided the best coverage, but I will submit to you under the TCA and under the law, they're not entitled to the best site. They're entitled to a site that provides commercially reasonable coverage, which is what they would get by their own expert's opinion in any of those three other areas. So by locating it there, we've alleged that they violated the added minimum requirement that exists in 3810, language that was bargained for and fiercely requested by the neighbors back in 1990 when they constructed the new water tower. Did the court make a judgment regarding standing or damages? Both. The court said essentially you haven't properly alleged damages, and because you haven't, you lack standing under the state statute, the Adjacent Landowners Act, and the Glen Ellyn Village Ordinance. So that segues into your argument on the merits. If this court were to find that the homeowners have standing to maintain the action, can you get to the merits and the interplay between 3810 and 5606 in terms of the added minimum language, which appears to be somewhat ambiguous. Is there a definition anywhere as to the phrase added minimum? Well, a definition per se within the statute or the ordinance, no. But interestingly, as we've alleged in our complaint, the village president, Vicki Haas, who voted in favor of the T-Mobile ordinance, had said that in her mind, and she was the key vote, by the way. Without Vicki Haas' vote, the ordinance wouldn't have passed. In her mind, at a minimum, then, when they could no longer put all the auxiliary equipment for those antennas within the water tower or on the water tower, they would not be keeping antennas at a minimum because now you have to locate on the lot. And what's interesting is when T-Mobile submitted its application to the village, they made it very clear in multiple sections of their application that they were going to locate all of their equipment within the water tower. That didn't happen. What happened instead was they located dangerous high-voltage electrical equipment on the lot outside the water tower, and we have included a photo of that, I don't know if you can see it from here, in our record below, and that is at record site 914. So the only definition we have comes from the village president, and it supports the plaintiff's position. Now, I don't think Ms. Haas knew, no one did, that when she said that, that T-Mobile was going to locate its high-voltage electrical equipment outside the water tower. So the term is ambiguous, but as far as legislative history and definitions, what we have supports the plaintiff's position. The plaintiff's position is that she has this legislative history. Absolutely. Correct. In 5606, which was about 13-some years later, the court specifically found that the existing antenna were, did not fit the definition. That's correct. And they interpreted the definition themselves, the board that acted on the ordinance. They did. In 5606, they put a finding in the beginning of the ordinance that said that they sought to harmonize 5606 with 3810 by saying that we find that we're keeping antennas at a minimum by limiting the tower to only three cellular antenna companies. So to me, the logic was sort of torture. They didn't focus on the number of antennas. They focused on the number of carriers in an effort to try to harmonize the two. And so I think that their efforts to do that were stretched or misplaced because the focus should always be the antennas, not the number of carriers that have their antennas on the tower. It was torture as it may seem. Is there any value of law that precludes the village itself from determining that, you know, 5606 conforms to the minimum requirements? No. Isn't that some evidence of their interpretation of the ordinance? It is evidence of their interpretation of the ordinance. But as we have alleged in counts one through three in attempting to enforce 3810 and the added minimum language requirement, it doesn't square with the spirit or the latter of 3810, which we under 1113.15 and 1010.18 are allowed to challenge. So they could just amend 3810 and take that minimum language out, couldn't they? They could. And, in fact, that was contemplated, as was mentioned in our complaint. Trustee Armstrong, Timothy Armstrong, had asked the residents at a hearing, said, can't we just amend it? And the residents said, you can amend whatever you want, but I think that would do violence to the rights of the residents to rely on the promises that your predecessor trustees made when they went to the effort of engrafting that added minimum language within 3810. That little thing you heard is your time limit, but in view of the nature of this case, I'll give you another five minutes. Okay. Let me use a little bit of that five minutes. So the village says, we're going to allow tenants to keep it to a minimum, and that was a compromise that was reached legislatively, I presume. Correct. And I'm not a big fan of compromise, and this is one of the reasons why. I mean, the people relied on that, and they should not, it seems to me, because, I mean, when you have that, it's just a way of people avoiding the decision. So now they send this, they can't decide what to do at the legislative body that governs Glen Ellyn, so they punt it to some judge sitting in Wheaton to decide what's the minimum. I mean, that doesn't seem like a very efficient way to do things, but ultimately the village itself has essentially knocked out that term, minimum. If one thinks, how many tenants are up there now, 20, 30? Twenty-three. Twenty-three. I would be hard-pressed to say that that's minimum. I don't think anybody could reasonably say that's minimum, but if the village has the power to say they can take the word minimum out, and they come out 13 years later and they say, this is what we mean by minimum, what power do we have to do it? I agree that when the people, you said the people argued that if you do that, if you took away the minimum, you'd be doing violence, whatever, to their expectations and the reliance on the people. They should have never relied on that. Who went back then? Because they compromised. And compromise is sometimes good and most times not. But right now, what authority do we have to contradict the village that has the authority to even take out the word minimum? If they can take the word minimum out, they can define it any way they want, I suppose. What authority do we have to do something? That's a good question, Justice O'Malley, and I will tell you that the defendants made the argument in their brief that 5606 implied the amends 3810 to do exactly what you're suggesting. Well, we have one rule. We're supposed to be getting the harm they show. And what I would say to you is this. In the case laws, there's not a lot of case laws because it's a very unusual situation. But when you have an ordinance or a law that expresses a requirement, like add a minimum, and it exists for a period of time, and then you have another law that comes along and it does something that could be seen as in conflict with it, the normal case law says the later enacted statute impliedly amends the first one with some certain provisos that was inadvertently enacted, and we can get into that, but I don't think it's necessary. But when, and here's the exception, when that earlier law is brought up into that newer law and it's referenced and embraced by that law, and as you mentioned, Justice Bowman, that's what happened here. The village took that add a minimum language from 3810 and they put it into 5606 in their attempt to harmonize it. They embraced that add a minimum requirement. So if you're saying we can disregard 3810, the add a minimum language, because you have the subsequently enacted 5606, I would respectfully disagree and say that if you're going to enforce anything, it's that add a minimum requirement because 5606 embraces it. As tortured as their logic was, it embraced it. But there's an issue more subtle than that. Yes, they embraced it, but can't you make the argument that they then redefined add a minimum with 3610? You certainly can make that argument. What I would say to this, Justice Hudson, is we never got the opportunity to marshal the legislative history, the evidence. The judge knocked us out of the box on the motion to dismiss. That question, whether one amends the other or what that statute means, is a fact question, and we should be able to marshal our evidence and the discovery to make our best case. The lower court wouldn't even give us that opportunity. Are you saying now you shouldn't have gone out on a summary judgment motion? We didn't go out on a summary judgment motion. We went out on a motion to dismiss. Yes, because that question that you're both raising is a fact question,  and we were never given the opportunity to have our day in court to make that claim. And I want to emphasize one thing. Everything we're talking about is 3810. Counts 4 through 6 of the complaint deal with enforcing 5606 itself. So even if the judge was to knock out 3810 and say you can't bring it, we still have the ability and the right to enforce the restrictions in 5606. So the antenna height restrictions, the excessive antennas on the megapod, the electrical equipment located outside, and the RF emission levels are all fair game regardless of what happens to 3810 because 5606 will still be in existence. I have a factual question because your time is limited. Is the electrical appliance attached? We have a photograph. I'm doing the photograph. It looks like the electrical appliance is somehow attached to the tower. It's not. I've seen it. It's not. It's a separate. It looks almost like an erector set type of setup, but it's a panel and it's pushed onto the panel. It's located next to the tower, but it is not. And then regarding the RF waves, your position is the Telecommunication Act does not apply. It doesn't apply. It only applies when permits are denied and the carrier then is aggrieved and has the right to come in and say you violated my rights under this federal statute. When you grant the permit, there's no need to invoke the TCA because you've gotten what you want. The FCC did not preempt the field. That's your position. That is my position. We've cited the litany of case law about all that, including the right to regulate RF emissions when they present a health or safety issue.  Anything further? Thank you. All right. Good morning, Justices. Good morning, perhaps. Good afternoon. My name is Rayford Palmer. I represent T-Mobile USA and T-Mobile Central LLC. My co-counsel, Ellen Emory, represents the village of Glenelg, and I'll be handling the argument for both parties today, gentlemen. Your Honors, the trial court made it clear in her initial written opinion that, and I'll quote directly, although the plaintiffs have taken great pains to allege that they and their properties are or will be adversely affected by the adoption of Ordinance 5606, they have failed to allege how they are or will be disadvantaged by the violation of that ordinance, i.e. the exceeding of the height limitation contained in that ordinance. Because they challenged the ordinance itself as time-barred, they must allege how they are negatively impacted by the violation. The court was getting to the fact that the plaintiffs didn't properly plead standing in this case. It's not whether they pled damages. The statute clearly says that plaintiffs in this situation need not plead damages. They need to plead, not only do they need to plead they will live within 1,200 feet, but the statute also requires that they plead that they've sustained a substantial effect by the violation of the ordinance. This the plaintiffs have failed to do. Substantial effect has not been defined by any court in the state from our view. The substantial effect comes under the ordinance, not the village. It comes under 111350. Yes, sir, that's absolutely right. And that's the language in that act requiring, providing the requirements for people to bring a private cause of action, public policy being otherwise if you had no requirement, essentially you'd open the floodgates of private litigation against people for violating pretty much any ordinance, any zoning ordinance whatsoever in any way. So clearly there's a balancing the legislature had in mind with 111350. To have it, you must plead a substantial effect.  The Supreme Court clearly said they're not going to address 111350 directly. There have only been about three or four cases that have found in Illinois that a substantial effect existed. They're procedurally different than this case in that typically they were trial, you know, opinions that were reviewed by the appellate court. But those cases, the big distinguishing feature is, this is the court's frustration at the trial court in our case, distinguishing these violations from the status quo ante, how you split out the effect or the nature of the attendance as they are now, the nature of the pot as it is now, from the way it was before. This the plaintiffs have failed to do in their second amendment. Well, how could they ever do that? I mean, you have a real issue. And as I read in your case, maybe a little bit broader than that, we're held that the homeowners didn't have to show it was a nuisance. They've alleged that the highly visible, unsightly, intrusive antenna have affected their property values. Okay. How would they ever, isn't it the nature of the violation itself that gives them a right to allege standing? I mean, how are they going to prove it if they don't have the right to a hearing? Yeah, Your Honor, actually, that's a good point. But the problem is, the violations here are indistinct from the existence of before him and have not pled to show what's different about today. The effect, the water tower affected the value of the property just by being there. There were cell phone antennas on the water tower before him. There was electrical and other hardware mounted around the tower before all this happened. The plaintiffs have failed to allege, sir, how this is different or new and substantially affecting them. That's what the court was concerned about, the crux of the… Even though they've alleged all these new antennas? Right. It's that still, well, how does one separate the substantial effect of the new antennas, Your Honors, from the existing situation? Weren't the Verizon antennas on the lower part of the water tower and then moved to the top? There were some antennas, sir, that were mounted, you might say, around the neck of the tower, and there were some antennas that were mounted on top of the ball of the tower that were then assembled or attached to the pod afterward. So doesn't that affect the sight line? Doesn't it affect the view at all? Well, respectfully, sir, it's 130-some feet above the ground. Honestly, to get to the merits of it, which we haven't done, I don't know what the sight lines would be other than aircraft or stargazing. But with all due respect, this is the problem that the plaintiffs have here. In these other cases where, in Illinois, the courts have reviewed the substantial effect or have found that a substantial effect existed, by the way, not defining the term, unfortunately, for us, one issue was a parking lot that was zoned residential but was being used for commercial vehicles. Land was not landscaped. Bumper guards not erected in violation of the zoning ordinance. Another case, Nottingham v. Lucky Stores in the 3rd District, residential lots used for commercial purpose, a business parking lot, a clear and distinct violation of the zoning ordinance rather than, for example, let's say some commercial vehicles in a lot and now several more are added or moved in some way. That's really the distinction we're trying to point out in our brief in this case. So what was the change then? It went from how many antennas to how many? Sir, it went from 13 antennas to, I believe, 23 antennas, sir, in total. Between T-Mobile's antennas, Verizon, I think AT&T, some other providers have antennas there as well. So your position is their complaint does not sufficiently allege how the additional 10 or whatever, 12 antennas makes a difference from what was there before to cause a substantial effect that wasn't there before? That's right. They can't plead in their complaint the substantial effect required by the statute. Even though the antennas almost doubled, they still haven't been able to feed it, that has a substantial effect on a 12 versus 23 or whatever it is? It's, again, the term substantial but effect. Although there is a change, sir, in the number of antennas, how can they plead? They can't plead that the change has an effect because the antennas are already there. There are already RF emissions. There's already an unsightly effect of the water tower, et cetera. So what if it doubled again, went to 50? Again, respectfully, Your Honor, I don't know that that would make an effect. It's not the number. It's the effect that the plaintiffs have to plead. And the sign that warns people of the health risks of coming too close, is that there all the time? That's actually, that was added to the outside of the equipment box, sir, and obviously we haven't tried this case. This is at a motion to dismiss stage. The sign is actually required by FCC regulations to be mounted on an equipment box of this nature. But that wasn't my question. I'm sorry, sir.  The sign's new, sir. It is new. That is new, sir. And the fact that it's required because these additional antennas are creating more radio frequencies? Sir, we have not even addressed those facts in this case at this point. So I wouldn't be able to answer that question, sir. Okay, thanks. But the sign is new, that I can say. If we carry your argument off the logic to its logical conclusion, then, you seem to be saying that if the village allowed, I'm sorry, 150 antenna up there, the plants would never be able to show the difference versus the effect of the earlier 23 antennas. So in essence, then, you'd be immune from ever challenging, you put 1,000 antennas out, right? Your Honor, I think at some point there may be a substantial effect that's able to be played. I think I have to concede that to be logically consistent. At some point, if we make, if we double the height of the tower with another antenna tower, there's probably a substantial effect to be played. In this case, the trial court and the defendants are stating there isn't a substantial effect played. The plaintiffs can't show a standing. And there are a lot of other reasons why the court dismissed this case as well. One important thing being that a lot of, in a lot of ways, this is an attempt to end run the enactment of two ordinances, 3810 and 5606. And too late pursuant to the statute of limitations under 111325, 90-day statute. I think the statute's pretty clear. And I suppose I could ask this on rebuttal to opposing counsel. Are we exalting form over substance? I suppose I was going to ask him because, as Justice O'Malley sort of alluded to, when the village then enacted 3810, I think you make the argument that they determined that the 3810 was then, or 5606 conformed to 3810. That's absolutely right. In fact, they made a specific finding, sir, that 5606 was in harmony with 3810. And the plaintiffs go through great, great detail in the legislative history in this case in their complaint, which is interesting, which to me suggests that this is really a collateral attack on passage of this legislation. And too late, being more than a year after the fact. Is there any legal impediment that would prevent the village of Glen Ellyn from doing away completely with this minimum language? Could they do that, sir? Yeah, can they do that? Apparently, they could do that by their legislative process. For whatever reason, they chose to issue the special use permit, 5606, and just find that it was in conformity with 3810. Or they could determine that there is not going to be a minimum language part, right? Sure, theoretically, Judge, Justice, they could amend that statute or strike out that portion, repeal that portion. Absolutely. Thank you. Let me answer this question. 1113.15 provides an owner or tenant need not prove any specific, special, or unique damage to himself or property or any adverse effect upon his property from the alleged violation in order to maintain a suit under the foregoing provisions. And I think it's rather clear that 1310 provides for a height of 140 feet. And the present intent is to exceed that, to an extent, some short distance to a maximum, I think, of seven feet. And why wouldn't they have the right to proceed under the ordinance? Because there is a violation of the original ordinance, height restriction. Again, sir, in absolutely in agreement with the court, the law, the statute's clear. There's no need to plead damages in the case. They have to plead the violation existed, but they have to plead there's a substantial effect. They have not convinced the trial court that they've pled properly that this height exceed that we have to take their allegations is true. Of course, at this stage, they have not pled with sufficient specificity. How the changes in these antennas or the height, the extent of the height of these antennas substantially affect them. They do state that they're taller. They say that plaintiffs are likely to believe that a violation alone is enough. They're reading of in the nature of the violation itself language from Greer. They would have this court believe that that means any violation is OK. All you have to plead is a violation and you're fine. You can go forward with the case. But substantial effect is in that statute for a reason I respectfully submit. And it is to provide it. You might say a screening device to establish standing so that there isn't an avalanche of private litigation against anyone for any de minimis violation of the zoning ordinance. We're going to find they have standing them. Does that affect this issue of the de minimis violation? If this court found there was standing, sir, if this court found there was sufficient standing, there was still yet to answer your question first directly. But then it leads me to another issue. If the court found there was standing, there are still other problems with the case that would require this case remain dismissed, sir. But if the court finds they have standing, assuming we got to the trial stage, the trial court would have to decide if the violations are de minimis, etc. And make a judgment at that point. As to the effect of these, obviously, violations, albeit are de minimis of a couple of feet. Just to be careful, sir, we haven't admitted the violations. We're on the stage. But yes, at some point we need to have evidence gathered, discovery, summary judgment and trial. And the court has to make a fact decision at that point or perhaps make a decision at the summary judgment stage. Possibly on a lot of the same issues all over again. So but the other issue that you led me to justice was the TC preemption issue. And that's very interesting because if the court were to say that T-Mobile had to remove the pod and the antennas from the tower, that would really create an immediate violation of Telecommunications Act, which preempts the field in this area. The TCA states no state or local government instrumentality may regulate placement, construction, and the mode of personal and wireless service facilities on the basis of environmental effects. And in addition, they cannot unreasonably discriminate among providers of functionally equivalent services. And local governments cannot prohibit or have the effect of prohibiting the provision of personal and wireless services. Making this provider move to another location when they don't need to move is a violation of the TCA. Because they are a functionally equivalent provider. And the local government, that essentially being the court, then mandating to Glen Ellen that they've got to take this down, would then have the effect of prohibiting the provision of personal and wireless services at that location. Being a violation of the TCA. So in the case of the plaintiff's sites are distinguishable. Yeah, that's correct, sir.  It's interesting because the plaintiff cites several cases in his brief to go through the TCA, but never really addresses the issue directly. And it's not that this case is preempted by the TCA. It's not that the defendants are stating to this court that we should be in federal court today. It's that we're going to be in federal court if the court requires that the pod come down. It's that the TCA will preempt the field at that time. Last question. Yes, sir. The electrical class that apparently is alleged to be outside of the parameters of the water tower. What's your position on that point? And consequently a violation of 3810-5606. Yeah, the allegation related to that is a new addition on the Second Amendment complaint. It wasn't on the first or second. It's attached to the equipment on the tower. And it's, again, this is really a fact question. We haven't really addressed it at this stage. But that equipment, there's other equipment there next to that box, all part of the parcel of the tower. So we'd have to get into parsing what attached or part of the tower is. Now, in other words, between the antenna and the electrical class that there's an attached or connection. Yeah, that's correct, sir. There's a base of the tower and then the large tower, the neck itself, or whatever we call the pillar, the ball. And that equipment, all at the base of the tower, is part and parcel of that tower. And it appears to be attached. But, again, we have to take the plaintiff's allegations as true at this stage. The plaintiffs have not pled a substantial effect under the statute. I must mention one thing, if I may, due to time. Glen Elm is not a proper part of this case. There's clear law on that under 1113-15. They should remain dismissed in this case as well for that reason. Thank you very much for your time, Your Honor. Great. Case is taken under revised and the court stands adjourned at this time. This is a rebuttal? Oh. It was a rebuttal? Yeah. Oh, I'm sorry. Rebuttal. I'll be brief. Briefer than you realized. I know. A lot briefer than I realized. I just want to make two quick points. One is we haven't talked at all about the village ordinance itself, and I think it's important to put that into the record. It says, this is 1010-18, in case any building or structure is erected or maintained or any land is used in violation of the Zoning Code, any person whose property value or use is or may be affected by such violation may institute an appropriate action or proceed. The lower court never addressed that language. And while we've talked a lot about substantial effect, we haven't talked at all about this, and I would respectfully submit that that is about the lowest threshold you can have to state a claim when you put in the word maybe. That just says a mere possibility. So is it a mere possibility that someone's use and enjoyment of their property would be affected by this? Yeah. Is it a mere possibility that the property values would be diminished because of the unsightliness, the RF emissions, the dangerous electrical boxes? Yeah, it is. The lower court never addressed that issue, never took out the ordinance itself. So that's one point I wanted to make. Counsel, let me ask you this. Although it may not be politically advisable, couldn't the village of Glen Ellyn amend 3810 and remove the at a minimum language out of there completely? Again, I think that they have the legislative authority to go through the process, and it will be met with strong opposition, and we'll see if the newly constituted trustee board is willing to do that. But, yes, they could. The bottom line is they could, but they chose not to. They chose to embrace that at a minimum language. So even if they abrogated the language in 3810, they're still stuck with it in 5606. They still have that at a minimum language in 5606, and we can seek to enforce that as well because they picked up on it. They have specifically embraced that language. The other point I wanted to make to you was that, with respect to the village being a proper party, the case law is clear that when a municipality is sued in its capacity as an executive, that is, where they either refuse to enforce an ordinance or they don't enact an ordinance or they exercise a discretionary authority to do that, they can't be sued. But that is in this case. In this case, the village is the private landowner, and they are not immunized from a lawsuit as a result of that. When they act as a private landowner, they're as liable as any other individual owns that private property. Is there any case law authority that supports that proposition? Well, I would just refer you to the plain language of the statute. Aside from that, maybe a novel question for first impression. It's an issue of first impression for you on that point alone. But I will tell you that there's an additional source that allows you to hold the village liable. And that is, in 3810 and 5606, they included boilerplate language at the end of the statute that says they're consenting to being sued. They've waived any immunity they have. And I have that language here. It's quoted in our brief. But they've agreed to be sued. It's stock language in all their ordinances. It's at the end. It says, you know, we can be sued for any violation. And that's in this ordinance? Yeah. It's in 5606 and 3810. In fact, I'll quote the language to you if I can. I have it in here. Here. This is in both 3810 and 5606. Failure of the owner or other party in interest or a subsequent owner or other party in interest to comply with the terms of this ordinance after execution of such ordinance shall subject the owners or party in interest to the penalty set forth in Section 101018 and of the Village of Glenelg and Zoning Ordinance. They have waived any immunity they may have by including that language in 3810 and 5606. Are they using the term owner? They are the owner of 3810, and they are a party in interest to 5606 as the lessor of the leasehold estate. And for other reasons, that's their property. They're responsible for what happens on it. They have an interest in making sure that whatever happens on that property, it complies with the law. And I think that's a good way to end this, which is, look, we've got violations here. Those allegations in our complaint have to be accepted as true. I sometimes struggle with the concept that you have willful violations of the law, and yet we find ourselves in the appellate court here, and we weren't even given the opportunity to do discovery, to marshal the evidence, and establish these things. And I think it's a real injustice, particularly when it's the executive who is supposed to be charged with the sanctity of these laws, willfully violating them, and then turning around and saying, you can't sue us, you can't do it. One final question. I'm not sure of the significance of this, but let me ask. Your opponent mentioned that if the trial court or we were to order the removal of some of these antennas, that would trigger the Telecommunications Act, and this would end up in federal court anyway? You know, they can try to remove. There's a case, and I wish I had the name of the word, that this happened. And I'm quoting in my brief. It's a remand case. They tried to remove it to federal court, and then there was a motion to remand, and the motion to remand was granted, and the court found that there weren't any federal issues. It was basically state law concepts trying to enforce ordinances, so they can try to do that, and we'll move to remand. The TCA doesn't apply to this case, and that's a speculative argument. We'll start again. The case is to take under advisement for extensive research. Thank you very much. Thank you.